COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                               NO.
02-10-00002-CV

 

 

IN THE INTEREST OF J.A.G., 

A
CHILD

 

 

                                                       ------------

 

               FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

Sixteen-year-old
Appellant J.B.G., of whom the Texas Department of
Family and Protective Services (TDFPS) has managing
conservatorship, appeals the trial court=s
order terminating her parental rights to her three-year-old son, J.A.G.  After a bench
trial, the trial court found by clear and convincing evidence that Appellant
(1) engaged in conduct or knowingly placed J.A.G.
with persons who engaged in conduct which endangered his physical or emotional
well-being and (2) knowingly placed or knowingly allowed J.A.G.
to remain in conditions or surroundings which endangered his physical or
emotional well-being.[2]  The trial court also found that termination
of Appellant=s parent‑child relationship with J.A.G.
would be in his best interest.[3]  In five points, Appellant contends that the
evidence is legally and factually insufficient to support the endangerment
findings and insufficient to support the best interest finding.  Because we hold that the evidence is legally
and factually sufficient to support all the trial court=s
findings, we affirm the trial court=s
judgment.

As
we have explained in a similar case,

Endangerment means to expose to loss or
injury, to jeopardize.  The trial court
may order termination of the parent-child relationship if it finds by clear and
convincing evidence that the parent has knowingly placed or knowingly allowed
the child to remain in conditions or surroundings that endanger the physical or
emotional well-being of the child.  Under
subsection (D), it is necessary to examine evidence related to the environment
of the child to determine if the environment was the source of endangerment to
the child=s physical or
emotional well-being.  Conduct of a
parent in the home can create an environment that endangers the physical and
emotional well-being of a child.        .
. . Under subsection (E), the relevant inquiry is whether evidence exists that
the endangerment of the child=s physical or
emotional well-being was the direct result of the parent=s conduct, including
acts, omissions, and failures to act. 
Termination under subsection (E) must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.      To support a
finding of endangerment, the parent=s conduct does not necessarily have to be directed
at the child, and the child is not required to suffer injury.  The specific danger to the child=s well-being may be
inferred from parental misconduct alone, and to determine whether termination
is necessary, courts may look to parental conduct both before and after the
child=s birth. . . .  A parent=s decision to engage in illegal drug use
during the pendency of a termination suit, when the parent is at risk of losing
a child, supports a finding that the parent engaged in conduct that endangered
the child=s physical or
emotional well-being.  Thus, parental and
caregiver illegal drug use supports the conclusion that the children=s surroundings
endanger their physical or emotional well-being. . . .  As a general rule, conduct that subjects a
child to a life of uncertainty and instability endangers the child=s physical and
emotional well-being.[4]

The
trial court heard the following evidence. 
Before the referral culminating in this case, Appellant=s
immediate family had been the subject of many referrals.  Her mother (Grandmother) had prostituted
herself and Appellant in exchange for drugs. 
J.A.G.=s
birth father (Father) was twenty-one years old at the time of J.A.G.=s
conception, and at some point during their relationship, Father and Appellant
lived together in his aunt=s
trailer.  Based on Father=s
relationship with twelve-year-old Appellant, encouraged by Grandmother and
condoned by his family, Father was later convicted of aggravated sexual assault
of a child and sentenced to seven years in prison.

Appellant
testified that when Father discovered that she was pregnant, he told her that
it was best that she be with Grandmother, who was threatening him Aabout
money.@  Appellant then went back to Grandmother, and
Father disappeared.  Appellant testified
that she was still not in a position to take care of herself at that point
because of her age.  She explained that
during her pregnancy with J.A.G., AIt
was a rough time because . . . me and my mom were
living in a home.  And my mom . . .
got mad at me because there was no money . . . to pay the hotel room.  And sometimes . . . she hit me in my stomach.@  Appellant also testified that she Ahad
to insist@
that Grandmother take her to the doctor during the pregnancy and that she would
walk if Grandmother would not take her to the doctor.  Appellant gave birth to J.A.G.
two days after her thirteenth birthday.

Appellant
did not like living with Grandmother, who hit Appellant and threw things at
her.  Appellant did not report
Grandmother=s
abuse because Grandmother threatened to have J.A.G.
removed from Appellant and convinced Appellant that she and J.A.G.
would be mistreated in foster care.  So even after CPS began a family-based services case, Appellant
left home for a time with J.A.G.

In
June 2008, after Appellant and J.A.G. had returned
home, TDFPS removed Appellant and J.A.G.
from Grandmother=s
custody.  Father=s
parent-child relationship with J.A.G. and Grandmother=s
parent-child relationship with Appellant were ultimately terminated.  Neither Father nor Grandmother is a party to
this appeal.

After
the removal, Appellant and J.A.G. were initially
placed together in an emergency shelter. 
About two weeks later, they were placed together in Seton Home, a San
Antonio placement for teens with children or teens expecting children.  David Gandara, the
original TDFPS caseworker for both Appellant and J.A.G., testified that TDFPS
originally planned for Appellant and J.A.G. to stay
at Seton Home until a parent (presumably Appellant=s
father, E.G. (Grandfather)), could complete a service plan successfully.  Then, TDFPS would
conduct a monitored return of Appellant and J.A.G. to
Grandfather.

While
living in Seton Home, Appellant had individual therapy, group therapy, anger
management, and parenting classes.  Gandara testified that she told him repeatedly that she did
not need individual counseling and Athat
it wasn=t
for her.@  According to Gandara,
Appellant had verbal and physical disputes while at Seton Home but minimized
her involvement.  He testified that she
tended to claim that she did not remember much when confronted about her
misconduct.

Appellant
had a fight at school that she claimed was not physical; she was charged with
retaliation.  She was blamed for chipping
paint off a wall at school but told Gandara that she
was not involved.  Gandara
spoke to no one at Appellant=s
school.  Appellant also skipped school
frequently, despite the facts that child care and transportation were provided
and her school attendance was court-ordered.

One
physical battle occurred in her home at the facility in front of J.A.G.  Gandara testified that Appellant had told him that the
other girl approached her, Aand that=s
about as far as she remembers.  The next
thing she knows is they were fighting.@  Gandara also
testified that Appellant changed her story: 
she originally told him that J.A.G. was about
ten feet away; towards the end of her narration the baby was only Aa
couple feet@
away from the fray.  At trial, Appellant
testified that she had a physical fight with J.A.G.
located Aone
or two feet away.@  J.A.G. was not
physically injured.

At
one point, Appellant barricaded herself and J.A.G.,
along with another teen and her child, in her room.  Appellant wrote graffiti signs, gang signs,
and a threatening comment on the walls during the incident.  She also left the facility twice without
permission, at least once with J.A.G.  Finally, multiple incident reports indicated
that Appellant left J.A.G. unattended in his stroller
on occasion.

When
Gandara spoke to Appellant about his concern that she
was jeopardizing her placement at Seton Home, she told him that she did not
like the home and did not want to be there and that that was why she was acting
out.  She told him that the counseling
was Astupid.@  But she also told him that she liked the
parenting classes and believed that they were helping her.

Gandara
opined at trial that Appellant=s
actions at Seton Home indicated that she was not taking matters seriously, she
was not sincere in getting better, and her
noncompliance with rules and structure was worsening.  On May 1, 2009, Appellant asked Gandara what would happen if her conservator, TDFPS, temporarily removed J.A.G.
from her care because she was having a lot of difficulties going to school and
taking care of a child.  Appellant
testified that even at Seton Home, where she had a lot of support in taking
care of J.A.G., there was Atoo
much pressure@
because she had Ato do what they [told her]
to do.@

After
Appellant and J.A.G. were removed from Seton Home on
June 3, 2009, and placed with Grandfather, whose home had been approved by TDFPS for a return and monitor placement.  TDFPS provided no
services to Appellant and J.A.G. while they lived
with Grandfather.  Gandara
did not visit the home at all before the placement.  He also did not visit the home during
Appellant and J.A.G.=s
twenty-three days there, nor did he know if anyone else from TDFPS had.  Appellant
testified that a caseworker visited once.

Gandara
testified that Appellant told him after the removal from Grandfather that she
engaged in frequent unprotected sexual intercourse in Grandfather=s
home.  She also told him that Grandfather
was rarely home and that no food or money was available.  She testified that the house was dirty and
messy when she and J.A.G. arrived.  She also testified that Grandfather was not
really living in the home and that he was neither helpful nor supportive.  Appellant admitted that she had Gandara=s
telephone number but never called him to report her living conditions, nor did
she tell the local caseworker who visited once, because of her fear that TDFPS would take J.A.G. away from
her.

Appellant=s
drug-addicted sister, who worked as a prostitute, and
her baby were also staying at Grandfather=s
house.  Appellant admitted that before
the Amonitored@ return,
she had told Gandara that her sister no longer lived
with Grandfather.

Appellant
testified that her sister would leave the house and Appellant would Ahave
to stay with [J.A.G.] and her [sister=s]
son.@  Appellant Adidn=t know what to do with two kids.@  She testified that she Awas
in too much stress@ and Atoo
much pressure@ and
therefore overdosed on June 28, 2009, on antidepressants belonging to her
sister.  According to Gandara,
Appellant told him that she took the pills to Afeel
better.@  She testified that she never passed out, but
he testified that he believed that she had.

Cheri
Fry, the CASA worker for both Appellant and J.A.G.
from the initial removal from Grandmother, testified that Appellant had told
her that she had Athought the more pills she took,
the better it would make her feel.  And
so she had taken a lot of them.  And then
she said that the next thing she knew, she woke up in the hospital.  She hadCwas
unconscious.@

Appellant
testified that her sister was outside with J.A.G.
while she was taking the pills but that they came back in.  Fry testified that J.A.G.
was in the room when Appellant took the pills. 
Appellant testified that she thought that she had taken all the pills,
closed the bottle, and put the bottle Awhere
it belonged.@  But J.A.G. grabbed
the bottle and Aone or two@
pills that must have Agot[ten]
stuck@ in
the cap.  Appellant testified that she
told her sister to call 911.  The baby
was found by emergency responders with a pill in his mouth and a pill in his
hand.  Appellant admitted at trial that
the incident endangered J.A.G.

Applying
the appropriate standard of review,[5]
we hold that the evidence is legally sufficient to support the trial court=s
endangerment findings.  Further, applying
the appropriate standard of review,[6]
we hold that the evidence is factually sufficient to support the trial court=s
endangerment findings.  We overrule
Appellant=s
first four points.

The
trial court additionally heard the following evidence.  After her overdose, Appellant and J.A.G. were removed from Grandfather=s
home and placed separately.

After
meeting Appellant and a transporter at her new foster home, Gandara
could not say unequivocally that he visited her again, although he testified
that he Ahad
a coworker that was going through that area stop by at least once.@  Appellant=s
foster mother sent her to therapy beginning in August 2009, and Appellant was
voluntarily admitted to Millwood Hospital in early September 2009 immediately
after a psychiatric evaluation.  From the
admitted medical records, it appears that Appellant remained at Millwood and
then The Excel Center for inpatient care for about two weeks.  She was diagnosed with major depressive
disorder and placed on antidepressants, a mood stabilizer, and anti-anxiety
medication.  Despite TDFPS
having gained at least temporary managing conservatorship over Appellant more
than a year earlier and the reasons for that change in conservatorship, and
despite the separation from her young son and the reasons for that separation,
it appears that the September evaluation was Appellant=s
first psychological or psychiatric evaluation.

After
her release from inpatient care, Appellant attended day treatment at The Excel
Center.  Group therapy records from The
Excel Center indicate that Appellant sometimes behaved inappropriately or slept
in group therapy, was hypersexualized, minimized her
history, and avoided dealing with her feelings and the past.  In at least one session, Appellant indicated
that she did not want to try to regain custody of J.A.G.
 The therapist indicated in the notes
that Appellant was unwilling to accept responsibility for her behaviors and
refused to see the impact of her behaviors on others.  The following day, the therapist reiterated
in the notes that Appellant was unwilling to accept responsibility for
inappropriate behaviors Aand make changes that might
allow her to see her son or to get custody of her son.@

While
she was attending day treatment at The Excel Center in October 2009, Appellant
engaged in inappropriate sexual behavior with a classmate.  On the same day, Appellant was discovered Acutting@ or Ascratching@
herself with her library card.  These
incidents precipitated Appellant=s
return to Millwood.  Appellant Achose
to go@
back to the hospital.  Appellant=s
second bout of inpatient care at Millwood and then at The Excel Center ended
October 21, 2009, six weeks before trial began.

Her
foster mother testified that after Appellant=s
second hospital stay, she completed her treatment at The Excel Center and
returned to public school.

Appellant=s
regular therapist, Laura Greuner, a licensed clinical
social worker, testified that she first met with Appellant on July 29,
2009.  Greuner
again saw Appellant on August 26, September 2, November 4 (after Appellant=s
treatment at Millwood and The Excel Center), November 18, December 9, and
December 12.  Greuner
opined that Appellant was stable since leaving Millwood in late October 2009
but admitted that part of that conclusion was based on discussions with the
foster mother.  Greuner
explained that Appellant

doesn=t seem as depressed
or anxious.  She presents herself as more
focused, like she has a goal and like she=s trying very hard. . . . 

 

. . . . 

 

And I . . . wasn=t all for her going
to Millwood because I didn=t really see her as
someone that wasCyou know, at the time
she . . . didn=t seem to be severely depressed or acting out
suicidally or anything like that.  But it seemed like Millwood ended up doing
her some good, because, when she came out, it definitely seemed like she had
made some progress from where she was before.

 

Greuner
testified that she usually has communication with TDFPS
caseworkers during this type of case but had had no communication with
caseworkers in this case.  She believed
that she had left a message with Gandara at the
beginning of her professional relationship with Appellant.

Exhibits
admitted at trial on Appellant=s
behalf showed that she was doing fine in school.  Appellant=s
testimony indicates that she has long-term goals of independence but recognized
that at the time of trial she was not capable of independently caring for
herself and her son.  Her testimony also
shows an awareness of her mental illness and an acceptance of the potential
need for continued medication and counseling. 
Appellant also admitted in her testimony that she sometimes Ablack[s]
out@
when she gets angry.

Fry
noted that contrary to Appellant=s
foster mother=s
testimony that Appellant had always behaved well in her current placement, Appellant=s
foster mother had called Fry on average twice a week about behavior and other
issues regarding Appellant.  Fry
testified that termination of Appellant=s
rights would be in J.A.G.=s
best interest, based on the cycle of instability and Appellant=s
inability to demonstrate that she could Aparent
[J.A.G.] safely, long term.@

Rayanne Climer, who replaced Gandara as
both Appellant=s
and J.A.G.=s
caseworker on September 15, 2009, testified that Appellant=s
foster mother had discussed with her some of Appellant=s
troubling behaviors, including improper sexual activity, attempted
self-mutilation, and violations of rules at The Excel Center.  Climer also
testified that Appellant=s maturity level is lacking
and that Appellant has complained to her that it is unfair to expect Appellant
to make adult decisions at her age. 
Appellant=s complaints, however,
related simply to going to school and obeying rules.  Climer specifically
testified that Appellant had told her that TDFPS was Aexpecting
a lot of her as a 15-year-old to make adult decisions.@  Climer admitted
that other than court appearances, an October 27, 2009 visit to the foster home
was the only time that she met with Appellant before trial.

The
evidence is contradictory regarding Appellant=s
conduct while living with her foster mother, but it is undisputed that at
trial, her foster mother supported reunification and was willing to have J.A.G. placed in her home.

Gandara
testified that placing J.A.G. with Appellant was not
an option because they had been placed together at Seton Home and with
Grandfather, and neither placement was successful.  But Appellant=s
foster mother testified that during Climer=s
October 27, 2009 visit to the foster home, Climer
told her and Appellant that if Appellant behaved well for two months, then she
could have her son back, and her rights would not be terminated.  Appellant testified that Climer
had told Appellant and her foster mother that if Appellant Awas
good several months, possibly two months, that [she could] possibly get [her]
son back.@  Climer conceded
that she did tell them that Appellant had a chance of getting J.A.G. back, even though she knew at that time that TDFPS=s goal Aon
paper@ was
termination.  The termination trial began
less than six weeks later.

In
the more than five-month period between the time they
were separated and the day trial began, Appellant and J.A.G.
had only about seven visits.  Appellant
conceded that some of the visits were missed because of her hospital stays and
a staph infection.  Additionally, Fry
stated that when Appellant attended Athe
Excel program, they didn=t
want to interrupt her therapy to schedule visits.  They thought it was more important to be in
therapy.  And then after that, I can=t
tell you why there weren=t
visits.@  It is not clear from the testimony who Athey@
were.  Fry testified that she knew of
occasions in other cases when weekend visits were held even when therapy was
not an issue.  Fry also testified that
she thought that the inconsistent contact between mother and child was hard on
both Appellant and J.A.G.

Climer
admitted that a twenty-five-day gap in visits between Appellant and J.A.G. that occurred between October 27 and November 21,
2009, was TDFPS=s
fault.  Both parties indicated that at
some point the foster parents of Appellant and J.A.G.,
not TDFPS, were left with the responsibility of
assuring that the mother and toddler had visits.

Climer
observed the October 27 visit at Appellant=s
foster home and agreed Awith the testimonies of
other people@
that J.A.G. and Appellant had a bond.

TDFPS=s
plan was for Appellant=s maternal uncle, A.G., and
his wife, L.G., who have
been married for twenty years and have two biological children, to adopt J.A.G.  L.G. had seen J.A.G. once when he
was about two months old.

They
are willing and eager to raise and adopt J.A.G., but
not Appellant.  L.G.
explained that she believed that with Appellant=s
history of running away from foster homes and cutting her wrists, her lack of
stability, and the likelihood that she would not improve,
her presence in the home would have adverse affects on J.A.G.
and the couple=s
two biological children.  A.G. was
concerned that Appellant could negatively affect the stability of his own
children.  Both A.G. and L.G. testified that it would be in J.A.G.=s
best interest for Appellant=s
rights to be terminated.

L.G.
testified that she would be willing to allow Appellant to visit J.A.G. as long the visits did not harm him
emotionally.  L.G.
also testified that she would ensure that Grandmother would have no contact
with J.A.G.

Based
on the appropriate standards of review, we hold that the trial court=s
best interest finding is supported by legally[7]
and factually[8]
sufficient evidence.  We overrule
Appellant=s
fifth point.

Having
overruled all of Appellant=s
points, we affirm the trial court=s
judgment.

 

LEE ANN DAUPHINOT

JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED:  November 10, 2010











[1]See Tex. R. App. P.
47.4.





[2]See Tex. Fam. Code Ann. ' 161.001(1) (D), (E)
(Vernon Supp. 2010).





[3]See id. 161.001(2).





[4]In re J.W., No. 02‑08‑00211‑CV,
2009 WL 806865, at *4 (Tex. App.CFort Worth Mar. 26,
2009, no pet.) (mem. op.) (citations omitted); see also In re J.O.A.,
283 S.W.3d 336, 345B46 (Tex. 2009).





[5]See In re J.P.B., 180 S.W.3d 570, 573B74 (Tex. 2005).





[6]See In re H.R.M., 209 S.W.3d 105, 108 (Tex.
2006); In re C.H., 89 S.W.3d
17, 28 (Tex. 2002).





[7]See Tex. Fam. Code Ann. ' 263.307(a), (b)
(Vernon 2008); In re R.R., 209 S.W.3d 112, 116
(Tex. 2006); J.P.B., 180 S.W.3d
at 573B74; Holley v.
Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).





[8]See Tex. Fam. Code Ann. ' 263.307(a),
(b); R.R., 209 S.W.3d at 116; H.R.M., 209 S.W.3d at 108;
C.H., 89 S.W.3d at
28; Holley, 544 S.W.2d at 371B72.